Mr. Warner, you're up first. Good morning. Good morning, Your Honor. May it please the Court, members of the Court. The Supreme Court in Loving v. Virginia said that marriage is one of the most fundamental, most basic rights of man, fundamental to our very existence and survival. This case is one of the cases that tests that ideal. The appellant, Timothy Skalsky, was a school's custodian. He alleges that he was forced out of his job as a school custodian because his wife gave a speech to the school board advocating the sharing of superintendents and the cutting of administrative expenses, including several principals. He contends that in the days following his speech, his assignment was changed to an outdoor assignment, which is one that he could not do, and that he was given a worst schedule for summer hours, schedule that they had not used in the previous two years, where they had rotated summer hours. They gave him a worse schedule in retaliation for his wife's speech. Having some problems, financial problems, I didn't quite understand. If they'd laid off somebody, was it a part-time custodian? Was that person the one that was working outside and now they were needing somebody to cover that time frame because they'd had to, for fiscal reasons, had to lay off somebody? Judge Riley, that's correct. So what is discriminatory about that? You're saying because they picked him to do that? Right, exactly. And that was based on his wife speaking up at the board meeting? Exactly. See, the problem there was that they . . . we don't question . . . Let me finish my thought on that. So then what were the alternatives? Were there other custodians that could have covered that? Absolutely. And the record shows that? Absolutely. The record shows that there was a more qualified custodian by the name of Todd Moen who had previously done the job, the outdoor job. In fact, he was the filling custodian for that position, had done the landscaping, the lawn mowing, the entire outdoor job. Mr. Skolsky had not. My question of the courts can't regulate how businesses run their businesses. Tell me why. I mean, we're not going to tell an employer who they're going to put in certain positions and what time of day. So what is it that would require us to intervene in this case in particular that would tie it so that we're not involving ourselves in the operation of a business which is not our job? Sure. And what it is in this case is that there's a lot more than just the fact that Mr. Skolsky was not qualified for the position for the outdoor position and that there was a more qualified person for that position. I realize that there is room in the law for businesses to be able to make legitimate business decisions as to who to put into a particular position and that the courts don't want to interfere with that. The courts don't want to become the personnel directors for the states involved. But there's a lot more to this case than that specific kind of a determination. In this case, Mr. Skolsky was so clearly unqualified for the position that . . . Why do you say that? Because, first of all, he'd never done the outdoor position at all. Ninety-five percent of his work was indoor work. Secondly, he had a bee sting allergy, which they were aware of, which would require him in this position to work outdoors alone for long periods of time where he would not have the protection of other people who could help him in the event that he suffered a bee sting allergy. And so because of that fact, because of the fact that the other six custodians that they had to choose from were not suffering from this allergy, it made him less qualified than those people, certainly the least qualified. It made the most sense from a humanitarian standpoint, but also from a business standpoint, to have him stay in the indoor position and move someone else, this Todd Mowen in particular, the most experienced person, into that outdoor position. Mowen ultimately took the position after Mr. Skolsky left, but there's more than that. What's your evidence of a causal connection at that decision? Again, realizing we as a court don't make decisions necessarily about who's qualified and who isn't qualified, but unless there's a causal connection to some protected interest there, the free speech and the marriage issue. So what's the causal connection? The causal connection is that the superintendent, you have to understand the whole context of the events here as they occurred. The superintendent of schools did not like the speech given by Mr. Skolsky. He was opposed to the concepts that she was advocating, which was basically the elimination of his job as superintendent of schools and the cutback of principals under his jurisdiction. At the same time, Mr. Brooks, the superintendent of schools, was in the process of setting up his own corporation to provide superintendent services to this school district. And he had actually entered into a contract, which was terminable at will by the school district, to provide those kinds of services. Now, the school district, the school board, when they heard the allegations, or heard the suggestions, I should say, from Mrs. Skolsky on sharing of a superintendent, became very interested in those proposals, proposals which the superintendent opposed and which threatened his new contract provision. They became very interested in it and actually voted to investigate it that night. And there's testimony in the record, page 200 of the appendix, where the school board chair actually called four or five other districts to find out about sharing of superintendents and what that would do in terms of being able to save money for the district. So the superintendent's job was threatened by the speech that was given by Mrs. Skolsky, the wife of the custodian. So there's motive there. There's a reason why he would be upset about that particular speech that she gave. There's also evidence of hostility on the part of the superintendent towards Mrs. Skolsky and her ideas. Is there any evidence? I mean, that's all a given at this stage of the case, but who made the decision to change the hours, the reassignment? Is that something the superintendent does? That is something the superintendent does. The superintendent was involved in that decision. When Mr. Skolsky first protested the decision, his supervisor, Mr. Messer, told him, well, Dan and I have already checked that out, and that's in the record. So there's testimony that the superintendent was actively involved in the decision to terminate or to reassign Mr. Skolsky to the outdoor position. That testimony, we think, helps establish that link between the decision itself and Mr. Brooks, the superintendent. What were the adverse consequences of let's assume that this was retaliatory action on the part of the superintendent? He alleged a damning interference with a marital relationship in terms of what? Psychic injury to the couple? We do allege that, and there's testimony in the record from Mrs. Skolsky about the harm that was caused to the marital relationship financially and psychologically. But we go further than that, Your Honor, and we say that it's not required under the Mount Healthy test, which is the test that's used for determining whether there's a retaliatory discharge. It's not required that there be that specific evidence presented. It's presumed from the meeting of the requirements of the Mount Healthy test. There's three requirements. One is that you engage in protected activity. If Mount Healthy, then the fact of the damages, that's for the jury to determine. Exactly. Would it end up being, what, nominal? It potentially could be nominal in certain cases. The point of the lawsuit is to vindicate Mr. Skolsky's or Mrs. Skolsky's First Amendment rights. Mr. Skolsky. Mr. or Mrs.? Mr. Mr. Yes. And under that Supreme Court case, Thompson, you think you've satisfied the requirements that that's? Absolutely. Absolutely, and I think that's where Thompson went wrong, was that Thompson didn't talk about it in terms of First Amendment freedom of association rights. Thompson talked about it in terms of First Amendment free speech rights, and where the husband was trying to. . . And maybe from your lights, they should have gone, should have reached a different holding on a different basis, but how does Thompson support your case? Thompson supports our case only in the sense that in dicta, it suggests that this kind of a claim is perfectly permissible, but what happened was in Thompson, they pursued the wrong theory. In Thompson, they had the husband trying to say, I'm going to assert the wife's First Amendment rights. That's not what happened in this case. Well, the problem I have is that if the wife were the employee and they retaliated against her, it would be much cleaner. Absolutely. But here you've got a second step removed, and I think that makes the causation a little harder to prove. It makes the causation harder to prove unless you apply the Mount Healthy test and follow through on what the requirements are under Mount Healthy, which is simply that we have a protected activity, which is the marriage. We have adverse employment action, which is the constructive discharge, and we have the substantial or motivating factor leading to it. What is the connection to the marriage? Judge Wollman asked something about this, but I'm having trouble saying there's a connection that they were trying to interfere with their marriage. Well, the problem is that there's only one way in which the superintendent has any control in this whole situation over what Mrs. Skolsky is going to be saying. He can't regulate Mrs. Skolsky, so he does the next best thing, and he goes after the custodian who works under him, who he has authority over. And that's where you get into the retaliatory discharge cases in First Amendment freedom of association cases. That's the way in which that arises. If you look at the Sowards case, if you look at the Adler case, if you look at the Adkins case, the Second Circuit and the Sixth Circuit, that's where those cases come down and say, yes, you can have retaliatory discharge cases based on the conduct or the situation or actions of the spouse. That's also true, by the way, under the Minnesota Human Rights Act, which we haven't even touched on but is in the brief, is that you can't fire someone in Minnesota or take adverse employment action in Minnesota because of the identity situation or actions of the spouse. In this case, her actions before the school board. This is the question I wish I would have asked at the outset of the argument. Putting it most simply, where did the Honorable Donovan Frank go wrong here? He wrote a very extensive, exhaustive opinion. In ten words or less, where did he go wrong? He went wrong on the First Amendment claim when he said that there needs to be proof of an intent to harm the marriage. When he needs to be proof of actual harm to the marriage, those things aren't provided in Mount Healthy. And where he analyzed the substantial or motivating factor by getting into factual disputes. There were specific factual disputes. If I could, I'd like to reserve the balance of my time for rebuttal. You may. Thank you. Mr. D'Arcy, good morning. Good morning, Your Honors. May it please the Court. I think what the Court needs to understand in order to properly decide this case and properly deciding this case is affirming summary judgment, is that there's no genuine issue of material fact. As this Court knows, whether we're dealing with a Section 1983 claim under the Mount Healthy test or whether we're dealing with a Minnesota Human Rights claim or a Title VII claim, the law requires some link between the adverse employment action and the employer's legally impermissible motive. So it matters not whether we phrase it in terms of substantial or motivating factor or whether, as the Minnesota Supreme Court has referred to it in the Minnesota Human Rights context, the circumstances of the adverse employment action must justify a conclusion that there's been unlawful discrimination. There has to be a link. That link is not present here. It's not present because the actual decision to move Mr. Skalsky's job assignment took place before the April 19 board meeting ever happened. I can't point Your Honors to an exact date because an exact date isn't in the record, but we know that that discussion took place, and it's on appendix page 149, which is the board minutes from April 21st, which talk about these budget cuts, budget decisions, considerations about cutting back staff and programs already being given to Superintendent Brooks way back in the prior December. But then we also have Mr. Brooks's own testimony and Mr. Messer's own testimony that they had a discussion about what to do with custodians before April 19, and the preliminary plan was we're going to move Mr. Skalsky's work outside once school's out, once June happens. I would like to address... In other words, your point is that no matter how retaliatory, what's the superintendent's name again? Brooks. No matter how retaliatory and evil-minded his decision was, following Mrs. Skalsky's address to the school board, I watched that, I listened to her on that CD. It's not all that inflammatory. It seemed to me a reasonable superintendent would have said, this is a provocative statement by an interested citizen, and perhaps I should pay some attention to it. But apparently Mr. Brooks is not of that mind, or was not. Was not of that mind in the appellant's mind, with all due respect. And your Honor has hit upon the weak... Is that all for a jury? But, of course, if you go back to your point, if this decision... And you say there can be no genuine issue of fact over when the decision to reassign Mr. Skalsky occurred. That's correct, Your Honor. Did it happen before the speech, end of case? End of case. If I may, to help the Court along that line, let's just set timing aside, because they make a big deal about, well, Mr. Skalsky was informed about this decision to move his work after the board meeting. It's sort of a post hoc argument. It's, you know, if this, then that. Just setting that aside, the appellant offers five reasons for why summary judgment was improper here. We've heard about, I think, two of them today, if I kept count accurately, two or three. The first is, well, Mr. Brooks had this motivation to punish the Skalskys, and in particular, the appellant. And your Honor picked up on that. But the truth of the matter is, and what they ignore, Brooks testified at his deposition that he was eligible for retirement even if the board decided to terminate his services. And the Court can find this testimony on Appendix Page 47, Deposition Page 62, Lines 9 through 16. Now that. Do I have to accept that? You have to accept it if there. It wasn't challenged? Yes. It was not subjected to vigorous cross-examination, and it was not. I'm saying challenged. This is summary judgment. Was any, well, go on. Your Honor's correct. It was not challenged. In fact, that testimony stands. It's never been impeached. There's no other contrary record evidence from which. In other words, was Mr. Skalsky relying on his complaints then? Mr. Skalsky's relying. Skalsky. Yeah. He's relying on his own, for lack of a better term, paranoia and supposition. Well, no, no, no, no. Not in terms of legal terms. Did he respond in any way to the motion for summary judgment by challenging what Mr. Brooks said in his deposition? Not with admissible evidence. That's what's critical here. A genuine issue of material fact can't be created just by me coming into court and saying, well, we'll see if somebody wants to believe him. If that testimony isn't challenged with other contrary evidence or with some vigorous cross-examination which gives the jury a reason to question the truth behind that testimony, a plaintiff can't avoid summary judgment just simply by arguing that credibility issues exist. If that is allowed to occur, Your Honor, we've turned back the clock and we've gone back to the pre-Celotex days where the defense can only win a motion for summary judgment if it comes in with evidence that completely obliterates and makes the plaintiff's claims impossible. And that's not the defendant's burden at summary judgment. Let me ask you, did Brooks testify? Who was the conversation he was having with? In other words, was it confirmed, corroborated by other testimony? John Messer, the Director of Buildings and Grounds. And it was actually, Your Honor, John Messer's idea to move Mr. Skalsky in the first place. So this isn't a situation, and there is no record evidence to the contrary, where Brooks is deciding, I'm really bent out of shape with what Ms. Skalsky said, I'm going to go off to get someone. You see, where they're trying to take this case is they're trying to take this into the waters of Adkins v. Board of Education. That case is very different on its facts, because in Adkins, the superintendent there told the plaintiff he didn't rehire her because he couldn't fire her husband and this was the next best thing. And, of course, there was a genuine issue of material fact about who said what and whether he really said that. We don't have those kind of circumstances here, Your Honor. What we have is undisputed record evidence that the appellant just doesn't like, and so he says, well, believe it if you want to, but it's a jury question, and then doesn't offer any alternative evidence. I'd like to, in that regard, talk about this Todd Moen being more qualified as a custodial worker. There are three discrete pages of the appendix that the appellant relies on to support that position. The first is appendix page 235. That's testimony from the union steward, Jim Prohl. And on page 21 of his deposition testimony, line 20, and this is a quote, Jim Prohl describes Todd Moen as just another custodian here. That's what they offer to support that there's a genuine issue of fact. Appendix page 240, this is testimony from Al Vandrill. He's the custodial worker who was let go. And he says he doesn't know what other custodians did at the school from 3 to 4 p.m. until 10.30 p.m., the hours that Mr. Skalsky would be working. So really, Vandrill has nothing to say whereby one could look at the decision to put Mr. Skalsky outside and say he's not the most qualified person. Then we have appendix page 232, John Messer's testimony. All we know from that is that appellant previously spent 95% of his time indoors. It doesn't say he doesn't know how to start a lawnmower. It doesn't say he doesn't know how to perform outdoor work. And indeed, part of Messer's testimony, which is also undisputed, that appellant isn't telling this court about today, is John Messer said, when I decide how to reassign people and who's best for a task, I don't just look at who they are, but I look at how they get along with other people. There's a whole mix of factors. And that's why, Judge Riley, I think that the court hit on a very important point this morning about we don't want to turn federal courts into glorified personnel directors who step into a business and tell a business how to run its shop. That's not what 1983 does. That's not what the Minnesota Human Rights Act does. Another curious point that I didn't hear a lot about, but it does dovetail with this whole animosity for the Skalskys is this set of e-mails. This is another item that is relied upon by the appellant to say that there are genuine issues of material fact. Apparently, after the April 14 or April 19 board meeting, there was a set of e-mails that went back and forth in the school between Mr. Brooks and a few others. Mr. Brooks wants to know who was that lady that spoke at the board meeting back in the 19th. He has to read those e-mails very carefully because the very last page of those e-mails shows how the string got started. It was Randy Olson, a reporter with the Sauk Rapids Herald newspaper. He thought Ms. Skalsky's speech was interesting, too. He wanted to be able to refer to her in his article. And so he asked Mr. Brooks, hey, who was that person that spoke? Brooks forwards the e-mails through the office. Does anybody know who this was? And that's the extent of it. What appellant wants the court to believe is that these e-mails are a vendetta to go after the Skalskys now because Brooks is somehow upset over Ms. Skalsky's proposals, and one just cannot fairly get that out of those e-mails. There is no genuine issue of material fact. We didn't hear a lot about it, but for the sake of clarity, I'll say something about it. This notion that the school district didn't save any money by this reassignment, well, indirectly it did. Mr. Vandrell lost his job and the same amount of work remained. One last point I want to touch on before leaving this topic is the school district knew that Mr. Skalsky could die if he had to do this assignment. I mean, that's really the way they dress it up. But what the record evidence actually shows is that Mr. Skalsky went to Messer and Brooks, said, I have an allergy. Didn't say it was life-threatening, didn't say he could die, didn't say anything about that. He even went to a doctor, Dr. Haig, I think it was on May 5th, and says, I need a letter saying I have a bee sting allergy. And Dr. Haig says to him, do you want a letter that says you can't do the job? And Mr. Skalsky says, well, no, I don't want that. I just need a letter that says I have an allergy. So all the administration knew when Mr. Skalsky was going to be reassigned is he has an allergy. It's a big difference between having an allergy and having a life-threatening one. And what the appellant is doing is they're taking their expert, who wrote a report for purposes of litigation, not about Mr. Skalsky personally, but about people generally, said these anaphylactic reactions can cause death in some people at some times, and now they're trying to say that, well, the school district should have known all of that at the time. And that simply isn't a fair reading of the evidence. Well, as Mr. Warner puts forth in his brief, though, Mr. Skalsky didn't live his life in a bubble. That's true. In other words, I guess he did what he had to do, but he had to do it with, let's see, what is this vial of medicine that he carries with him? An EpiPen, Your Honor. So it's not as though it were a merely psychosomatic worry in his mind. No, I mean, the condition is real, but it's one that he lived with and he dealt with, and the record evidence even shows that he coached his own son's baseball, and they weren't playing in the Metrodome. So for all these reasons, I think one can sum up the flaw in Appellant's argument simply by saying they point to no record evidence, which gives a jury something to do here. What they do is they hear the defense's evidence, and then they just say, well, that's not credible, or go tell it to a jury. That's not a way to create a genuine issue of material fact. I do want to say something about this constructive discharge business in the time that we have left. As the Court is aware, a constructive discharge happens when the employer intentionally creates a set of objectively intolerable circumstances that leave a reasonable person, not a hypersensitive employee, with no option but to quit. And here we don't have those circumstances either. There's another bit of testimony the Appellant doesn't address, and it's unfortunate. David Eink. Eink was the business manager for the union. He, on behalf of the Appellant, went and talked to Dan Brooks about this reassignment, what are we going to do, and it was Mr. Eink's testimony, and it's on appendix page 104, page 18, lines 15 through 21, that he didn't feel Brooks was adamant about having Mr. Skalsky fill this position anyway. He thought that if given some time, some sort of a deal could be worked out. Of course, these conversations were happening, if I may refer to my timeline, roughly around May 5th, not a lot of time between then and the time Mr. Skalsky decides to quit on the 23rd. Mind you, this reassignment hasn't even taken place yet. It won't take effect until June. So this is hardly a situation where we have constructive discharge, and if there's no constructive discharge, there can't be any adverse employment action either. Not a lot has been said by the Appellant this morning about the direct claims against, the tortious interference claims against Brooks and Messer. There the theory is that these gentlemen are acting outside the course and scope of their employment. They're acting for personal reasons and therefore subjected to personal liability, but that is defeated by Appendix Page 149, which shows that with these budget cuts and changes in staff and hours, they were doing exactly what they were supposed to do within the course and scope of their employment, and so that claim just goes by the wayside, unless the Court has other questions. May I ask one? Sure. Well, I would guess, I assume that Mr. Warner will mention this on rebuttal, so I'll give you a chance to talk about it now. He says in his reply brief, the school district is at odds with the district court when it contends that the timing of the decision to reassign was made before the speech by Mrs. Sklasky. The court held that this timing was a disputed issue of fact, pointing to the addendum, and indeed it was. The record shows that the school board did not even authorize any cuts or realignments for custodians until April 21. Maybe you addressed that early on in your argument, but the fact that the district court thought it was an issue of fact. If I may, the district court thought it was an issue of fact. What struck me by that statement, Your Honor, was the district court did not call it a genuine issue of material fact. Thank you. Thank you. Mr. Warner, you have a little over a minute and a half. Thank you, Your Honor. Just to get to the last point from Judge Wolman, we did cite in the record proof that the decision was made after the fact, which was the school board resolution of April 21, in which they tell the superintendent to issue the budget cuts and to issue the reassignments of the employees. And that's all after the fact, after Mr. Sklasky has been reassigned. I think the point is that what goes to the board are decisions that are recommended, but the decision to, I think what they're saying, the decision to move occurred before the statement. But I think what it does, though, Your Honor, with the fact that the school board resolution is the one that tells the school board or tells the administration what to do, that resolution occurs on the 21st of April, which is after the fact of when these things took place. So the argument of whether this happened before or happened afterwards is an argument that shouldn't be resolved on appeal when there's evidence that, in fact, there is a controversy over when that took place. Did you challenge Mr. Brooks' testimony by way of a response to the motion for summary judgment? Did we challenge his testimony? We challenged his testimony with the fact of the school board resolution. We also challenged . . . and this is important, I think, too, that what you're dealing with when you have that testimony is the testimony of interested witnesses, people who have been sued, who it is in their best interest to testify to those kinds of things. And the jury isn't required to accept that testimony when it's from interested witnesses. But what evidence did you have that would begin to poke holes in Brooks' testimony and the building and grounds person's testimony that they made the decision that the building and the grounds guy was the first one to bring it up, but they made the decision before April 19th? I think the testimony, Your Honor, the fact that the court found that to be a disputed issue of fact is important. And the court was relying upon the entire record as it occurred. Well, I'm asking you, what else is there in the record? I mean, the court could have been clearly wrong, but . . . So what would the district court have looked at to say that was a genuine dispute of fact? The court would have certainly looked at the April 21st resolution. When the April 21st resolution specifies and tells the administration that that's the time that it needs to start making these budget cuts and putting into effect these budget cuts. With respect to the other genuine issues of material fact, though, you have to look at the entire record and look at, you know, why is it that this decision is being made and does it make any sense for the administration in particular to continue on with this decision after clearly being advised of the issues that were concerning Mr. Skolski and the bee sting allergy and all the rest? Why does the school district continue? Why does the superintendent continue with that kind of conduct when it's clear that this is . . . there are other alternatives, other more sensible alternatives, other alternatives that are . . . I agree. I understand that. Thank you. I will say that I found your brief very interesting, not only on the merits, but on the phraseology. The defense never grows wings and takes flight. Again, about the district, the district skirted the issue as if it were a field of landmines. Some of our briefs are very . . . almost boring. These aren't. These weren't. Whether they affect the outcome, I don't know. But it's always interesting to read something that sounds like one of Paul Eng's briefs. I don't know if you know Mr. Eng. I do know Mr. Eng. Which is a compliment in my mind. I read a book called Point Made and it seemed to influence the brief. Thank you very much. Thank you. We will take your arguments, which we thank you for, both in the brief and the oral arguments, and take it under consideration. Thank you.